UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.  CASE NO. 8:13-cr-626-T-23AEP
     8:15-cv-110-T-23AEP

MICHAEL GALLON
_____/

**O R D E R**

Gallon's motion to vacate under 28 U.S.C. § 2255 (Doc. 1) challenges the validity of his conviction for sex trafficking of a minor, for which offense he is imprisoned for 405 months. Rule 4, Rules Governing Section 2255 Cases, requires both a preliminary review of the motion to vacate and a summary dismissal "[i]f it plainly appears from the face of the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief . . . ." *Accord Wright v. United States*, 624 F.2d 557, 558 (5th Cir. 1980)[1] (finding the summary dismissal of a Section 2255 motion was proper "[b]ecause in this case the record, uncontradicted by [defendant], shows that he is not entitled to relief"); *Hart v. United States*, 565 F.2d 360, 361 (5th Cir. 1978) ("Rule 4(b) [Rules Governing § 2255 Proceedings], allows the district court to summarily dismiss the motion and notify the movant if 'it plainly appears from the face of the motion and any annexed exhibits and the prior proceedings

---

[1] Unless later superseded by Eleventh Circuit precedent, a Fifth Circuit decision issued before October 1, 1981, binds this court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*).

in the case that the movant is not entitled to relief . . . .'"). Gallon's motion lacks merit because in the plea agreement Gallon waived the right to raise the grounds he asserts in the motion to vacate.

## **FACTS**[2]

Michael Gallon is a "pimp" that operates in the state of Florida and southeastern United States. Beginning on an unknown date, but at least February 2009, Gallon began recruiting adult and minor aged females to work for him. Gallon ran a "dance team" that performed and prostituted at bachelor parties and house parties around Florida and the southeastern United States, to include the state of Kentucky. Gallon transported the females to the parties and to prostitution dates, using federal highways, in his Lincoln Navigator and/or his Mercedes Benz.

**1. J.L.**
During the month of February 2012, when J.L. was 16 years old, J.L.'s friend asked her to accompany her to work for Gallon on an out-of-town weekend trip. J.L. agreed to go on the trip because her friend was nervous about going alone. On the following Thursday evening, Gallon, along with several other females, picked J.L. up in a black Mercedes-Benz. Gallon asked her how old she was and she told him 16 years old. Gallon told her that if anybody asks her age she is to tell them she is 18. Gallon transported J.L. and the other females in his vehicle to his residence, located in Lakeland, Florida, in the Middle District of Florida. Over the course of the night, 9 to 10 other females arrived at his residence.

The following morning, Gallon left his residence and went to the bank. He returned with hundreds of dollars in single dollar bills. Later that day, Gallon transported J.L. and several other females from his residence in Lakeland, Florida, to Lake City, Florida. On the way to Lake City, Gallon stopped in other locations, like Gainesville, and picked up additional females.

When they arrived in Lake City, Gallon drove them to a party that he had previously arranged. The party was held at a co-conspirators house located on North East Saint Clair Street in

---

[2] This summary of the facts derives from the plea agreement (Doc. 10).

Lake City, Florida. There were several older males at the party. The females that Gallon brought, some of whom were under the age of 18, removed their clothing and began to dance in a sexual manner. The men at the party paid the girls dancing with tips. Additionally, there were "VIP" rooms, where the girls engaged in commercial sex acts with the men at the party.

Gallon charged the men around $10.00 or $20.00 at the door to enter the party. If a man wanted to have sex with one of the girls, he had to pay Gallon around $30.00 to take the girl into a VIP room. Additionally, the girl also had to pay Gallon around $30.00 to use the VIP room to engage in prostitution acts with the men. While in the VIP room, the girls charged the men a separate fee for sexual acts, a portion of which the girls had to pay to Gallon. Gallon instructed the girls on what amounts to charge for various sexual acts. J.L. did not prostitute during the party.

After the party, Gallon drove the girls to a co-conspirators house located on North East Colorado Terrace in Lake City, Florida, to sleep for the night. That night, a male subject came to the property where they were sleeping and offered Gallon money to have sex with J.L.. J.L. told Gallon that she did not want to prostitute

J.L. continued to prostitute for Gallon, mostly on the weekends, for several months because he convinced her that he cared about her and that she was special to him. Most of Gallon's prostitution parties that J.L. worked occurred in Lake City, Florida. Men at the parties often sold narcotics to Gallon, which Gallon resold to the girls prostituting for him. The narcotics included cocaine, marijuana, and various types of pills, to include ecstasy (MDMA).

While J.L. was working for Gallon, he would invite her over to his residence before an out of town trip, so that he could have sex with her. Gallon's residence was a gathering spot for the females that prostituted for him. Gallon typically left Lakeland on Fridays to travel to prostitution parties in other locations. Many of the girls working for him were told to spend Thursday night at his residence to ensure Gallon had everyone together in one location prior to leaving.

During the months that J.L. worked for Gallon in 2012, there were several occasions that, in addition to the weekend prostitution events, she also worked "licks" for him. "Licks" was the name that Gallon used to describe when he arranged for a

female to be prostituted to a man on a one-on-one basis, outside of a party. J.L. advised that she did several "licks" for Gallon. On some instances when she did a "lick" for Gallon, she would go to his residence and Gallon would then drive her to meet with the man paying to have sex with her. After they were done having sex, the customer would drive her back to her own house. J.L. typically received none of the money the customer paid Gallon. J.L. estimated that while prostituting for Gallon she had sex with approximately thirty to forty men.

J.L. advised that Gallon often contacted her and the other females who worked for him, via cellular telephone when arranging parties and licks. Law enforcement found text messages between J.L. and Gallon on J.L.'s cellular telephone. The text messages corroborated J.L.'s statements. Some of the text messages are as follows:

> Gallon to J.L.: "Attn all dancers we have just been booked for a show in Kentucky on Nov tenth we will do a show that Friday before we leave more details this weekend at the Halloween party"
>
> J.L. to Gallon: "I'm mad I suppose to slept with u tonight Mike .. y u made me come lol ... n how much money he gave u for me"
>
> Gallon to J.L.: "Yes he paid you good to ahead see you ithe am"
>
> J.L. to Gallon: "OK n he bringing me bk in a half hour cuz he stay wit his GRANDparents n they a be getting up in a lil."

## 2. SEARCH WARRANTS
On May 3, 2013, law enforcement executed Federal search warrants on Gallon's residence, vehicles, cellular telephone, and a co-conspirators residence. The following is some of the relevant evidence that was discovered and seized:

**Lap top computer** - Law enforcement located a Compaq Presario laptop computer in the family room of Gallon's residence. Gallon admitted to owning the computer. A forensic review of the laptop computer revealed several photographs of females in sexually suggestive poses and clothing. Law enforcement identified at least

>one minor victim dressed in sexually suggestive clothing. A follow up interview with the minor victim, confirmed that the photograph was taken by Gallon while she was working at one of Gallon's shows in Madison, Florida.
>
>**Cellular Telephones** - Law enforcement seized two Apple iPhones and a Huawei Metro PCS from Gallon. The search of Gallon's cellular telephones uncovered dozens of photographs of females that law enforcement believes work or worked for Gallon. Many of the females are naked or in sexually suggestive clothing. At least one photograph depicts a naked minor victim.
>
>>(i) The child pornographic image depicts a 16 year old black female, sitting on a chair, completely nude, with her legs spread. The focal point of the photograph is the minor victim's breast and open vagina.
>>
>>(ii) The minor victim identified herself in the child pornographic photograph and advised that the picture was taken during a show she worked for Gallon in Deland, Florida.
>>
>>(iii) A forensic examination of the cellular telephones, revealed that Gallon forwarded the child pornographic picture, via text, to other cellular telephone numbers.
>>
>>(iv) Gallon's cellular telephones contained text messages between him and the females he employed as well as text messages between him and clients.
>>
>>(v) All of the cellular telephones seized from Gallon were manufactured outside of the United States.

## **GROUNDS**

Gallon asserts two grounds of ineffective assistance of counsel. First, Gallon alleges that counsel was ineffective for not objecting to the magistrate judge's acceptance the waiver of an indictment rather than submitting a report and

recommendation for the district court to accept the waiver. Second, Gallon alleges that counsel was ineffective for waiving the requirement that the government must either obtain an indictment or file an information within thirty days of his arrest. Both claims are waived by the plea agreement.

Gallon pleaded guilty under the favorable terms of a plea agreement. (Doc. 28 in 13-cr-626) *Tollett v. Henderson*, 411 U.S. 258, 267 (1973), holds that a guilty plea[3] waives a non-jurisdictional defect:

> [A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea.

This waiver of rights precludes most challenges to the conviction. "[W]hen the judgment of conviction upon a guilty plea has become final and the offender seeks to reopen the proceeding, the inquiry is ordinarily confined to whether the underlying plea was both counseled and voluntary." *United States v. Broce*, 488 U.S. 563, 569 (1989). *See also United States v. Patti*, 337 F.3d 1217, 1320 (11th Cir. 2003) ("Generally, a voluntary, unconditional guilty plea waives all non-jurisdictional defects in the proceedings."), and *Wilson v. United States*, 962 F.2d 996, 997 (11th Cir. 1992) ("A defendant who enters a plea of guilty waives all non-jurisdictional challenges to the constitutionality of the conviction, and only an attack on the voluntary and knowing

---

[3] A conviction based on a plea of nolo contendere is reviewed the same as a conviction based on a guilty plea. *Wallace v. Turner*, 695 F.2d 545, 548 (11th Cir. 1982).

nature of the plea can be sustained."). A guilty plea waives a claim based on a pre-plea event, including a claim of ineffective assistance of counsel. *Wilson*, 962 F.2d at 997. Consequently, the entry of a guilty plea waives a claim (other than a jurisdictional challenge or a challenge to the voluntariness of the plea) — including both a substantive claim and a purported failing of counsel — that occurred before entry of the plea.

Gallon waived both of his claims, which involve pre-trial issues, when he voluntarily pleaded guilty. Under the terms of the plea agreement, Gallon admitted his guilt (Doc. 28 at 17), acknowledged that he entered "into th[e] agreement and plead[ed] guilty freely and voluntarily" (Doc. 28 at 16), and specifically waived the right to an indictment (Doc. 28 at 3). These admissions bind Gallon. See *Blackledge v. Allison*, 431 U.S. 63, 73–74 (1977) ("[T]he representations of the defendant . . . [at the plea proceeding] as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity.").

Accordingly, the motion to vacate the sentence (Doc. 1) is **DENIED**. The clerk must enter a judgment against Gallon and close this case.

### DENIAL OF BOTH A CERTIFICATE OF APPEALABILITY AND LEAVE TO APPEAL *IN FORMA PAUPERIS*

Gallon is not entitled to a certificate of appealability ("COA"). A prisoner moving under Section 2255 has no absolute entitlement to appeal a district court's

denial of his motion to vacate. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a COA. Section 2253(c)(2) permits issuing a COA "only if the applicant has made a substantial showing of the denial of a constitutional right." To merit a certificate of appealability, Gallon must show that reasonable jurists would find debatable both (1) the merits of the underlying claims and (2) the procedural issues he seeks to raise. *See* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000); *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir 2001). Because he fails to show that reasonable jurists would debate either the merits of the claims or the procedural issues, Gallon is entitled to neither a certificate of appealability nor an appeal *in forma pauperis*.

Accordingly, a certificate of appealability is **DENIED**. Leave to appeal *in forma pauperis* is **DENIED**. Gallon must obtain authorization from the circuit court to appeal *in forma pauperis*.

ORDERED in Tampa, Florida, on December 7, 2015.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE